**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
**CAROLINE N. WESTBROOK,**

                              **Plaintiff,**

      **- against -**                                        OPINION AND ORDER

**CITY UNIVERSITY OF NEW YORK,**                            03 CV 5833 (NG) (SMG)
**MATTHEW GOLDSTEIN, EMMA ESPINO**
**MACARI, and LIA GARTNER,**

                              **Defendants.**
------------------------------------------------------------------x

**GERSHON, United States District Judge:**

Plaintiff Caroline N. Westbrook, an African-American woman formerly employed by defendant City University of New York ("CUNY") brings this action against CUNY and three of its employees who are individually named: Matthew Goldstein, Emma Espino Macari, and Lia Gartner (the "individual defendants"). Plaintiff alleges discrimination, retaliation, and creation of a hostile work environment on the basis of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); 42 U.S.C. §§ 1981 and 1983; and the New York State Human Rights Law, N.Y. Exec. Law §§ 296 *et seq* ("NYSHRL"). Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on all of plaintiff's claims against them.

## FACTS

Unless otherwise indicated, the following facts are undisputed.

CUNY is a university system comprised of 11 senior colleges, six community colleges, and four graduate and professional schools. *See* N.Y. Educ. Law § 6203. Within CUNY, the Office of Facilities Planning, Construction, and Management ("OFPCM") supervises the

1

planning, construction, and management of the university's construction projects and rehabilitation of current capital facilities. OFPCM consists of three units: (1) the Department of Space Planning and Capital Budget ("SPCB"), which oversees the long-range planning and programming of CUNY's capital building program and coordinates space management and reporting of facilities utilization on all campuses; (2) the Department of Design, Construction and Management ("DDCM"), which plans and implements CUNY's building programs and coordinates facilities maintenance; and (3) the City University Construction Fund ("CUCF"), a public benefit corporation that provides facilities for the university and supports its educational purposes.

Defendant Matthew Goldstein, a white male, has served as Chancellor of CUNY since September 1, 1999. As Chancellor, Mr. Goldstein is the chief executive, educational, and administrative officer of CUNY as well as the chief educational and administrative officer of the other educational units of CUNY. *See* Goldstein Exh. A (CUNY Bylaws). Both defendants Emma Espino Macari and Lia Gartner are employees of OFPCM, which, as of November 2005, was comprised of 38 Caucasian employees and 39 employees belonging to various protected classes.[1] From September 1993 until her retirement in June 2006, Ms. Macari, an Hispanic female, served as the Vice-Chancellor of OFPCM, working as the senior administrator responsible for all physical plant maintenance and operations, facilities planning, and capital programs for CUNY's various campuses. Ms. Gartner, a white female, served as the Director of

---

[1] Specifically, OFPCM consisted of thirty-eight Caucasians (49%), eleven African-Americans (14%), ten Asian/Pacific Islanders (13%), eight Hispanics (10%), seven Italian-Americans (9%), and three Puerto Ricans (4%).

DDCM from 1995 to January 2001 and then as the Director of SPCB from approximately September 2002 until February 2004.[2]

## I.  Plaintiff's Hiring

In April 1999, CUNY issued a Personnel Vacancy Notice regarding an open employment position as "Office Manager/Executive Assistant to Director" in the SPCB unit of OFPCM. A search committee consisting of representatives from OFPCM's three units—Ms. Gartner, the then Director of DDCM, Robert Zimring, the former Director of SPCB, and Russell Nobles, the former Deputy Executive Director and General Counsel of CUCF—interviewed a number of highly qualified candidates for the open position. The search was thorough and complied with CUNY's affirmative action guidelines.

On May 18, 1999, plaintiff interviewed with the search committee, and by letter dated May 21, 1999, plaintiff thanked each of its members for meeting with her and stated that "[it] was such a pleasure to meet all of you" and that "[t]he interview was a pleasant experience." Gartner Exh. A. Plaintiff later testified during her deposition that the contents of her letter were untrue as related to her experience with Ms. Gartner because Ms. Gartner was "combative, hostile, and negative" toward her during the interview. Westbrook Dep. at 58-59; Pl.s' Decl. ¶¶ 17-18. Specifically, plaintiff testified that Ms. Gartner spent "a lot" of time criticizing the choice of words used on her resume and commenting that her tone "wouldn't work with the union staff." Westbrook Dep. at 40-46.

At some point subsequent to the committee interview, plaintiff was invited to a second, one-on-one interview with Ms. Macari. Plaintiff testified that, in addition to explaining what was expected of the new hire, Ms. Macari made unsolicited comments about Ms. Gartner,

---

[2] Ms. Gartner temporarily left CUNY in or about January 2001 to become the Assistant Vice-President for design and construction at Columbia University.

describing her as a "perfectionist" and "making excuses" for Ms. Gartner's behavior and attitude toward plaintiff during the first interview. Westbrook Dep. at 50-52; *see also* Pl.'s Decl. ¶ 17. Plaintiff characterized these comments as "strange" because she had not brought up Ms. Gartner during their conversation and Ms. Macari did not mention the other two members of the committee. *Id.*

On June 1, 1999, upon the recommendation of the search committee, Ms. Macari offered the job to plaintiff. According to defendants, the search committee's recommendation was unanimous as to its preference for plaintiff, who, at the time, possessed approximately fifteen years of experience in office management and administration in legal and other service-oriented firms and was also enrolled in a Masters in Public Administration program at one of the CUNY colleges. Although Ms. Macari preferred the other finalist, Glenda Brooks, also an African-American female candidate, she ultimately followed the committee's recommendation as to this position and offered Ms. Brooks a different position as Special Assistant to CUCF. Plaintiff disputes that the committee's recommendation was unanimous and claims that Ms. Gartner did not approve of plaintiff's appointment to the position, given Ms. Gartner's negative attitude toward her during the committee interview as well as Ms. Macari's unsolicited "excuses" for Ms. Gartner. Plaintiff also testified that, between September 2002 and February 2003, she was expressly told by Eileen Hawkins, the former executive assistant to Ms. Macari, that Ms. Gartner had been opposed to her hiring.

Plaintiff subsequently accepted the offer and was hired in the functional title of "Office Manger/Executive Assistant" and in the payroll title of "Higher Education Assistant." As a Higher Education Assistant, plaintiff occupied a non-teaching, administrative position within CUNY's Higher Education Office ("HEO"). Whereas most of the other staff members in the

SPCB and the DDCM units of OFPCM were comprised of project managers, architects, planners, and engineers, who were responsible for supervising and developing capital budget requests for multimillion dollar construction projects and renovations of existing facilities, plaintiff's primary responsibilities included serving as an executive assistant to the Director of SPCB, supervising all support staff who did not report to a director of one of the OFPCM units, overseeing administration of personnel issues, and interacting with building management as the sole office manager at 555 West 57th Street in Manhattan (the "57th Street Office"), where plaintiff, the OFPCM offices, and outsider service providers were based.

The conditions of plaintiff's employment as a Higher Education Assistant were governed by the Collective Bargaining Agreement ("CBA") between CUNY and the Professional Staff Congress/CUNY ("PSC"), the union representing CUNY's instructional staff employees. The CBA provides that the HEO series of titles, such as plaintiff's, are subject to a series of annual or biannual reappointments that are offered at the discretion of CUNY. Article 13.3.b of the CBA further provides that, upon the recommendation and approval of the appropriate official and Board of Trustees, an employee may become exempt from the discretionary annual reappointment process if he secures a Certificate of Continual Administrative Service ("CCA"). The CCA is granted to employees who receive a sixth reappointment upon completing eight consecutive years of service and permits termination only under a narrow set of circumstances, such as the receipt of three consecutive unsatisfactory annual evaluations in three successive fiscal years.

Prior to the 2002-2003 fiscal year, the salaries of "tax levy" employees were paid directly out of the CUNY operating budget. However, pursuant to a resolution adopted by CUFC in 2002, CUNY established a "reimbursement" procedure for the payment of these salaries, under

which the operating budget would advance the salary amount and then the capital budget would reimburse that amount back into the operating budget. The capital budget, which is financed from the proceeds of bonds sold by the Dormitory Authority of the State of New York ("DASNY"), are funds allocated to CUNY for its capital construction and rehabilitation programs.[3] The change was implemented to reflect the fact that these employees were a part of the overall costs for the university's capital construction and rehabilitation programs.

## II. Plaintiff's Tenure at CUNY

Plaintiff, initially hired for a July 1, 1999 to June 30, 2000 term, was reappointed annually to her position three times. Each reappointment letter, sent by Ms. Macari at the end of the preceding term, stated that "[t]his offer is subject to financial ability" and that "[t]here is no presumption of employment beyond the period indicated." *See, e.g.*, Macari Exh. C; Pearson Exh. E. Plaintiff testified that she understood that there was no guarantee that she would keep her position beyond the year of appointment and that CUNY had the right not to reappoint her to the position for another year.

Throughout plaintiff's tenure at CUNY, she reported to the Director of SPCB. From 1999 until his retirement in 2002, Robert Zimrig, a white male, served in that capacity. Eric Anderson, another white male, then became the Director until September 2002, when Ms. Gartner took over the position. During the time plaintiff worked under Mr. Zimrig and Mr. Anderson, she received satisfactory employee evaluations and almost all outstanding ratings on the performance evaluation grid from her supervisors. In the summer of 2001, plaintiff also

---

[3] The State of New York determines the specific dollar amount of CUNY's capital budget, which is funded through borrowing rather than through direct appropriations. When the State approves an amount for the university's projects, it essentially authorizes, on CUNY's behalf, the borrowing of that amount through the issuance of bonds by DASNY, the authority that sells the bonds for the university's use. *See* Macari Dep. at 159-65; Macari Decl. ¶¶ 24-25.

received from Mr. Anderson a recommendation for a "step increase" in her salary, which Ms. Macari joined in endorsing because of plaintiff's "invaluable" performance.  Pl.'s Exhs. E, F. Despite her favorable comments about plaintiff at the time, Ms. Macari stated in her declaration that, in reality, she had "misgivings" about plaintiff's performance and had therefore rejected a similar recommendation made by Mr. Zimrig in 2000; she, however, decided to endorse Mr. Anderson's recommendation a year later "in order to show support for [her] director . . . and as an incentive for improvement by plaintiff."  Macari Decl. ¶ 13.

Plaintiff claims that she became a target for termination in the fall of 2002, around the time that Ms. Gartner became the Director of SPCB and her direct supervisor.  According to plaintiff, on or about September 16, 2002, Mr. Anderson informed her that Ms. Macari and Ms. Gartner were seeking ways to terminate her employment and that she should e-mail her resume to him so that he could help her find another job.  Plaintiff accordingly sent her resume to Mr. Anderson the next day and began a job search in response to this information.

Plaintiff claims that, about one week prior to becoming Director of SPCB, Ms. Gartner began complaining to her about the physical appearance of the 57th Street Office and that, when Ms. Gartner officially became her supervisor, she continued to hold plaintiff solely responsible for the cleanliness of the office even though cleaning was not a part of her job description. Plaintiff further testified that, while Ms. Gartner did not explicitly order her to clean the kitchen with her own hands, she did state that plaintiff was responsible for making sure the kitchen was clean and rhetorically asked her, "With no cleaning staff, who's gonna do it?"  Westbrook Dep. at 140.  Plaintiff also testified that, in at least one instance, Ms. Macari ordered plaintiff in front of her coworkers to remove her food items from the kitchen.

According to defendants, Ms. Macari and plaintiff simply had "differences of opinion about plaintiff's role as office manager in correcting problems with the physical appearance of the 57th Street Office." Gartner Decl. ¶ 12. Ms. Macari stated in her declaration that plaintiff "did not take responsibility for the current condition of the office" even though the facility was "not as neat and polished as it had been," and the kitchen in particular was "unsanitary." *Id.* ¶¶ 13, 15. Without blaming plaintiff for the condition, Ms. Gartner also requested that, "as Office Manager, she take the steps to locate a cleaning service provider to help rectify the situation." *Id.* ¶ 15. Ms. Gartner denies ever telling "plaintiff that she should personally clean those areas" and that she did not expect her to do so. *Id.*

Plaintiff disputes that she had any such "differences of opinion" regarding her role. In response to their conversations, plaintiff claims she suggested initiating a department-wide meeting in order to discuss the office's appearance and to discuss who had authority to implement the necessary changes but that Ms. Gartner refused such requests "on many occasions." Pl.'s Decl. ¶ 72. Plaintiff also held individual conferences with employees under her supervision regarding the proper protocol for discharging their job responsibilities, and sent out e-mails and memoranda to the entire department and individual employees, seeking their cooperation in maintaining the cleanliness of the building. Plaintiff further denies that Ms. Gartner asked or expected her to hire a cleaning service provider, though she nonetheless spoke with Al Toscano, the Director of Real Estate and Administrative Contact, about researching the possibility of hiring cleaning service providers. Westbrook Dep. at 74-76 (testifying that Ms. Gartner "just complained about the office space" and did not tell her to research cleaning service providers). Plaintiff claims that it was ultimately Ms. Macari who negotiated the terms of the contract with First Quality Maintenance, the company eventually hired to perform cleaning

services at the 57th Street Office.  Although defendants claim the problem ended once First Quality Maintenance was hired, plaintiff maintains that Ms. Gartner continued to complain about the cleanliness of the office.

In addition to these "kitchen instances," plaintiff testified that, at some point in 1999 or 2000, she heard Ms. Gartner refer to the students of Medgar Evers College, a predominantly African-American school, in a derogatory manner.  Specifically, during a discussion about the college receiving trailers, Ms. Gartner remarked that "those people" should not receive "anything more than absolutely necessary."  Westbrook Dep. at 91-92.  Furthermore, although Ms. Gartner "never directly said anything to [plaintiff] about [her] race" during the entire time she worked at CUNY, plaintiff testified that she "always made comments about [her] tone" and how it was "too authoritative."  *Id.* at 89-90.  Plaintiff also claims that many other individuals have filed lawsuits against Ms. Gartner, as she personally witnessed a file room full of lawsuits that were either settled or pending in 2002 naming Ms. Gartner as a party.  Defendants dispute plaintiff's claim and maintain that, during Ms. Gartner's entire tenure at CUNY, no other staff member of OFPCM apart from plaintiff ever filed a grievance, charge, or complaint of race discrimination against her.  Defendants also point out that, during Ms. Gartner's tenure at CUNY as the Director of DDCM, she recommended only two individuals for termination—Charles Collins and Corwin Frost—both of whom were white males.[4]

---

[4]  Plaintiff claims that Ms. Gartner also terminated Antonio Cox (incorrectly identified by plaintiff as "Anthony Cox"), a black male, in 1999, and cites only to her own declaration in support.  Pl.'s Decl. ¶ 20.  In response, defendants produce a letter on CUNY letterhead, from Meghan Moore-Wilk, the Chief of Planning, to Mr. Cox, which indicates that Mr. Cox took family leave from March 2, 1999 until March 12, 1999 and subsequently went on "unauthorized leave without pay."  The letter advised Mr. Cox that he must complete the appropriate application to continue on family leave.  Macari Reply Exh. A.  However, it is undisputed that Mr. Cox never returned to work.  *See* Macari Reply Decl. ¶ 3.

### III. CUNY's 2003 Budgetary Constraints

#### A. Hiring Freeze

In 2003, as a result of reduced state appropriations for fiscal year 2003-2004, CUNY was required to implement various strategies to reduce costs and increase revenue. Accordingly, in September 2002, Mr. Goldstein issued a memorandum to all of CUNY's college presidents directing that "colleges will be expected to view vacancies resulting from [CUNY's early retirement program] as an opportunity to re-structure administrative support in a manner that reduces costs and provides greater efficiencies." Dobrin Exh. A. Mr. Goldstein further instructed that "the replacement of non-teaching personnel will be subject to authorization" by CUNY and that "[a] rigorous protocol will be developed, which will require campuses to justify replacements taking into account the critical nature of the position, as well as the need to manage the budget, reduce costs and re-shape administrative functions." *Id.*

Effective February 3, 2003, CUNY also instituted a hiring freeze for all full-time and part-time non-teaching positions. Exceptions to the freeze were limited to bona fide offers of employment made on or before the effective date of the freeze and to specific positions deemed critical to health and safety or essential to CUNY operations. A committee chaired by Allan H. Dobrin, Senior Vice-Chancellor and Chief Operating Officer, reviewed written exception requests containing supporting justification from a College President or Vice-Chancellor.

#### B. Plaintiff's Non-reappointment

At or about the time the hiring freeze was announced, Mr. Dobrin held a senior staff meeting with the three Vice-Chancellors who reported directly to him, including Ms. Macari. During the meeting, Mr. Dobrin directed, and the participants agreed, that in light of the financial constraints that year, they should review their respective staffs with the goal of eliminating

unnecessary positions whose functions could be assumed by other employees. Mr. Dobrin could not recall discussing a specific dollar amount with respect to potential job cuts or providing Ms. Macari with "specific" parameters. Dobrin Dep. at 14-16. Ms. Macari testified that, while she was not given a "specific number," Mr. Dobrin provided a "range[] to effect some major reductions" in the approximate figure of about a $150,000 to be cut from the operating budget. Macari Dep. at 115-16.

Ms. Macari decided to respond to Mr. Dobrin's directive by focusing on reducing the administrative support staff of OPFCM rather than the construction, design, and planning staffs since there were several vacancies in those staffs she believed needed to be filled. Although some members of the administrative staff could not be eliminated because they were protected by a CCA, plaintiff, who was only a fourth year employee, along with at least three other administrative employees were unprotected by a CCA: (1) Ms. Brooks, an African-American woman, who earned more in salary than plaintiff at the time the hiring freeze was implemented; (2) Mr. Lechicky, a white male, who was hired about a year after plaintiff; and (3) Jie Liu, an Asian-American woman who held an HEO Associate position as Payment Supervisor in the Accounting Unit of DDCM.

Based on her personal knowledge of the functions of the staff, Ms. Macari determined that plaintiff did not have to be reappointed in order for OFPCM to continue its operations. Specifically, Ms. Macari testified that it was more feasible to redistribute plaintiff's responsibilities than those of Ms. Hawkins and Mr. Lechicky, two white employees who provided executive support to Ms. Macari, and Joanne Prestka, then Director of DDCM, respectively. Ms. Macari also considered Ms. Hawkins, her long-time assistant who essentially functioned as her chief of administrative staff, as "irreplaceable" and believed that Mr. Lechicky,

who worked as OFPCM's Capital Program Coordinator, possessed specialized experience and skills in administering construction project reports and proposals that neither plaintiff nor other members of the administrative staff could have assumed. Ms. Macari also did not consider Ms. Liu an "appropriate" person to consider for non-reappointment because she performed "a large number of critical accounting and payment functions," including processing all CUNY rental property payments and expenses as well as processing city and state capital project payments for all CUNY campuses. Macari Reply Decl. ¶ 18.

Accordingly, on or about February 26, 2003, Ms. Macari informed plaintiff that she would not be reappointed to her position for the July 1, 2003 to June 30, 2004 term. Plaintiff received a standard non-reappointment letter from Ms. Macari, which briefly stated that "[t]his letter shall constitute formal notice that your appointment . . . shall not be renewed." Macari Exh. L. Defendants state that the CBA does not require a non-reappointment letter to state the reason for non-reappointment. Plaintiffs claim that this is not true with respect to employees who have been reappointed four or more times and cites to the CBA in support. A review of the relevant section of the CBA indicates that there is no provision supporting plaintiff's contention. *See* Pl.s' Ex. A.

According to defendants, no one was hired to replace plaintiff and plaintiff's position as Office Manager was eliminated. However, in anticipation of plaintiff's departure from CUNY, many of plaintiff's job functions were temporarily reassigned to other employees, several of whom were African-Americans. Ms. Brooks was assigned to assume administrative and clerical support duties for Ms. Gartner; Denise Phillips was assigned to handle building management issues; and Nicole Harrington assisted Deirdre Dugan in coordinating Ms. Macari's calendar and organizing her meeting materials. Other employees, including Mr. Lechicky took over the day-

to-day supervision of the reception desk, support staff, and the mailroom, while Catherine Yang, an Asian-American female, supervised Ms. Phillips and the accounting staff, which handled the maintenance of petty cash and business expense accounts.

Plaintiff testified that, during her tenure at CUNY, Ms. Macari never criticized her performance, complained about the cleanliness of the 57th Street Office, made any comments about her appearance, or complained about her speaking too loudly. Plaintiff also testified that she never heard Ms. Macari make any racial comments.

### C. Hiring at OFPCM in 2003

#### 1. Pre-Hiring Freeze

On or about January 29, 2003, Ms. Macari offered Wendy Kalan, a white female, a position as "Project Manager III," a position that had been vacant since 2001. The hiring, though it occurred on a tax levy line, was exempt from the hiring freeze, as the offer was extended prior to the effective date of the freeze on February 3, 2003 as well as to Mr. Dobrin's request to the Vice-Chancellors that they review their staffs with the goal of eliminating unnecessary positions. Ms. Kalan, an architect, accepted the offer on January 31, 2003, and was thereafter responsible for managing construction and rehabilitation projects for DDCM.

#### 2. Post-Hiring Freeze

Between June and December 2003, OFPCM hired eight individuals, none of whom were hired as tax levy employees. Rather, the new hires were either CUNY Research Foundation employees or were placed into positions administered by the Research Foundation and therefore paid from sources other than the CUNY operating budget. Six of the eight new hires included two architecture interns, a project coordinator, an assistant director, a capital construction budget coordinator, and a technical support architect.

The remaining two hires, Joyce Briscoe, an African-American female, and Nancy Nichols, a white female, filled administrative positions, but both individuals replaced departing administrative employees. Ms. Briscoe replaced Christopher Togbah, an African-American male, who had been working full time hours at OFPCM as a "College Assistant." Because College Assistants were intended to be part-time clerical positions, any College Assistant working full-time hours was required to be appointed to the CUNY full-time Civil Service position of "CUNY Office Assistant," provided that the individual passed a civil service examination and made himself eligible for the appointment. Prior to the hiring freeze implemented in February 2003, Mr. Togbah and three other College Assistants—Nicole Harrington, an African-American female, Angela Gutierrez, an Hispanic female, and Diana Zayas, also an Hispanic female—who were working full-time hours took the civil service examination to be appointed as CUNY Office Assistants. Only Mr. Togbah failed the word processing portion of the examination. On March 23, 2003, upon notice of his non-reappointment, Mr. Togbah verbally informed plaintiff that he had accepted other employment and that his resignation was effective as of that date.[5] Ms. Briscoe thereafter took over for Mr. Togbah, performing clerical tasks at the 57th Street Office on a part-time basis.

As for Ms. Nichols, CUNY hired her in December 2003, initially on a temporary basis to replace Ms. Brooks after her resignation. By letter dated January 23, 2004, Ms. Macari offered Ms. Nichols a "full-time professional position as Special Assistant to the [SPCB] & [CUCF]," a position under the immediate supervision of Ms. Gartner and Ms. Moore-Wilk, the Associate

---

[5] Meanwhile, Ms. Harrington and Ms. Zayas, both of whom had passed the exam, were temporarily appointed in the full-time title of CUNY Office Assistant, effective April 1, 2003 and May 1, 2003, respectively. According to plaintiff, Ms. Gutierrez eventually failed the written portion of the examination, but continues to be employed as a receptionist, though she was switched from a tax levy budget line to a CUCF budget line.

Director.  Macari Reply Exh. D.  Ms. Nichols's responsibilities included: working with architects, space planners, budget analysts, and CUNY officials to implement CUNY's policies, procedures, and capital program at the various campuses; acting as a liaison for the CUCF Director and Trustees; administrative duties with respect to both SPCB and CUCF publications and correspondence; and coordination of the Director of SPCB's calendar.  The position did not entail the office manager duties that were a part of plaintiff's former position.  Ms. Nichols's annual salary of $50,000 was funded by CUCF and administered by the CUNY Research Foundation.

## IV.    Plaintiff Exhausts Her Annual Leave

When an OFPCM employee fails to be reappointed to her position, her department has the discretion to determine whether the employee must liquidate any accrued annual leave prior to the expiration of the current appointment or be paid for all or part of the annual leave, up to the annual leave cap of 45 days, in a lump sum at the expiration of the appointment.  The common practice of the department is to require the employee to immediately liquidate the accrued leave and not return to work because of possible disruptions to the workplace.  The CBA supports such a practice and provides, "It is the intention of the parties that all employees use their annual leave time within the annual leave year (September 1 through August 31) in which it is earned."  Pl.'s Exh. A (CBA § 14.9).

At the time plaintiff was notified by Ms. Macari that she would not be reappointed to her position, plaintiff had accrued 50 days of annual leave, which included five days in excess of the annual maximum.  In or about the end of March 2003, an incident occurred between plaintiff and Ms. Gartner, after which it was determined that plaintiff would commence exhausting her annual leave.  According to defendants, plaintiff refused Ms. Gartner's direct order that plaintiff give

her the keys to an office storeroom so that she could remove a stack of boxes from the reception area of the 57th Street Office prior to a meeting with outside personnel. Plaintiff claims, on the other hand, that Ms. Gartner "demanded" the keys from her, informing her that "[she] was no longer going to be responsible for . . . that work, the supplies—the storeroom and that she was taking the key." Westbrook Dep. at 181-82. Plaintiff also claims that, when she tried to explain that the office storeroom key was "the only key [they] had and that [she] wanted to make sure that the key was available to someone at the office because [Ms. Gartner] wasn't there often," Ms. Gartner started "screaming and yelling and making a terrible scene" and placed plaintiff in fear of being physically struck. *Id.* at 182.

According to plaintiff, on March 26, 2003, at approximately 9:30 in the morning, Ms. Gartner informed her "in a very nasty, confrontational and disrespectful manner" that her responsibilities would be reassigned to other staff. That day, plaintiff documented the incident, along with her preexisting complaints about Ms. Gartner, in an e-mail to Ms. Hawkins. Pl.'s Exh. GG ("Lia's negative attitude and confrontational manner towards me has been an ongoing situation since she returned to [O]FPCM in September and has been increasing and escalating in its intensity since that time. During many of these confrontations it almost appears that she would like to strike me.").

After hearing about the incident, Ms. Macari directed Ms. Hawkins to obtain guidance from Sonia Pearson, CUNY Central Office Human Resources Director, about whether she could require plaintiff to exhaust her annual leave immediately. Upon learning that she had authority to do so and in the hopes of effectuating a "cooling off" period, Ms. Macari provided plaintiff "formal notice that [she] should take [her accrued annual leave in excess of the 45 days] commencing March 31st, 2003" in a hand-delivered letter dated March 27, 2003. Macari Exh. T.

Ms. Macari further informed plaintiff in the letter that "[u]pon your return to the office, we will discuss the reassignment of your duties and revise your job responsibilities accordingly." *Id.*

A few days later, on April 2, 2003, plaintiff claims that she had a telephone conversation with Debra L. Bergen, PSC's Director of Contract Administration, during which Ms. Bergen proposed an offer from CUNY to pay plaintiff to remain out of the office through June 30, 2005 though she would have to use her accrued annual leave. Plaintiff immediately refused the offer and indicated that she planned to return to work on April 7, 2003, as originally planned. Defendants claim that Ms. Macari was unaware that CUNY's Office of Faculty and Staff Relations had made any offer to settle plaintiff's grievance or that plaintiff had rejected such an offer at the time she wrote plaintiff another letter on April 3, 2003, advising plaintiff that, "[c]onsistent with Article 14 of the [CBA], . . . you should continue to take your accrued annual leave until further notice." Macari Decl. Exh. U.

Plaintiff's total accrued annual leave covered her absence from the office until June 23, 2003, a few days short of when her current appointment term expired on June 30, 2003. In order to permit plaintiff to be paid through the last day of her appointment, Ms. Pearson informed plaintiff by letter dated May 14, 2003 that she would be placed on "paid leave status" until her official last day on June 30, 2003. In other words, plaintiff was paid not only for her accrued annual leave, to which she was entitled, but also for the five work days at the end of her appointment period that were not covered by her accrued annual leave.

V.      **Plaintiff's Appeals and Grievances**

In accordance with its long-established policies mandating equal employment opportunity, CUNY maintains an internal complaint procedure at its constituent colleges for employees who believe they have been victims of discrimination. Although plaintiff did not file

an internal complaint when the alleged discriminatory conduct started, she wrote a memorandum dated September 25, 2002 to the PSC Grievance Officer regarding the "campaign to push [her] out of [her] position."[6] Pl.'s Ex. II. In her "report of what happened," plaintiff states that Ms. Gartner has "an avid dislike for people of color" and that "[f]rom [her] personal observation and experience Ms. Gartner's belief system involves a mindset that certain groups should remain in their place." *Id.* Plaintiff testified that, out of her "good will," she initially held onto the memorandum to "see if the behavior would stop," but, in or about October 8, 2002, plaintiff gave a copy of the memorandum to the PSC grievance officer and Ms. Pearson. Westbrook Dep. at 158-59.

By letters dated March 14, 2003 and April 9, 2003, plaintiff also appealed her non-reappointment to Mr. Goldstein.[7] In her first letter to the Chancellor, plaintiff states, "I feel that I have discharged my responsibilities above and beyond the call of duty," but did not indicate that she was not reappointed because of reasons motivated by racial discrimination. Goldstein Exh. B. In her second letter, however, plaintiff expressed, "I have been deprived of a career that I thoroughly enjoyed basically because my direct supervisor, Lia Gartner holds an ingrained dislike for people of color." Goldstien Exh. C. Plaintiff did not personally speak with Mr. Goldstein regarding her appeal, nor did she receive a response from him.

---

[6] CUNY's internal complaint procedure permits "employees who are covered by collective bargaining agreements [to] use their contractual grievance procedures . . . to report allegations of discrimination" in lieu of its own procedure. Goldstein Ex. F at 3.

[7] Plaintiff also includes in the record a copy of a letter dated April 4, 2003 that is addressed to Mr. Goldstein. The letter includes a detailed summary of the circumstances leading to her non-reappointment and specifically describes plaintiff's belief that Ms. Gartner created a "hostile and predatory work environment" and discriminated against her "solely because [she is] black." Pl.'s Exh. CC. Defendants claim that the letter, while signed by plaintiff on April 7, 2003 and notarized the same day, was not sent to or received by Mr. Goldstein.

Instead, according to the usual practice of Mr. Goldstein's office, plaintiff's letters of appeal were forwarded to a CUNY administrator who would respond directly to the employee. In this case, Mr. Dobrin, as Ms. Macari's direct supervisor, received and responded to both of plaintiff's letters. By letter dated April 18, 2003, Mr. Dobrin informed plaintiff with respect to her first letter that "your appeal has been denied based on my review of the facts," and with respect to the second letter, that her reappointment was due to "budgetary constraints." Goldstein Exh. D.

In addition to her letters of appeal, plaintiff filed grievances under the CBA against CUNY on March 21, 2003 and May 15, 2003, with respect to her non-reappointment and the manner in which she was required to use her accrued annual leave. Plaintiff was represented by PSC as to her non-reappointment grievance but was informed that the union could not "find a basis upon which to file a grievance on your behalf" as to the annual leave grievance. Specifically, the PSC stated that plaintiff had not incurred any harm as a result of CUNY's actions since she was paid through the end of her reappointment term and that it would be unable to demonstrate "a breach, misinterpretation or improper application of the agreement in this matter." Klekman Exh. F. Plaintiff nonetheless initiated the annual leave grievance on her own behalf. Both grievances were denied at Steps One and Two of the process. Upon reviewing the Step Two determination as to plaintiff's non-reappointment grievance, the union informed plaintiff that it would not recommend the case for arbitration because it did not find that there is a "reasonably good chance of prevailing." Klekman Exh. E.

On April 7, 2004, plaintiff subsequently filed a Charge of Discrimination against CUNY with the United States Equal Employment Opportunity Commission ("EEOC"). On or about August 18, 2003, the EEOC issued a Dismissal and Notice of Rights to plaintiff, finding that,

"[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  Pl.'s Exh. NN.

**DISCUSSION**

I.    **Standard of Review**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Flanagan v. GE*, 242 F.3d 78, 83 (2d Cir. 2001).  However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), but "must come forward with specific facts showing that there is a genuine issue for trial," *Matsushita*, 475 U.S. at 586-8 (emphasis removed).

District courts are cautious about granting summary judgment when intent is at issue since "a victim of discrimination . . . is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence."  *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).  However, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a

talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Therefore, summary judgment is appropriate where the standards of Rule 56 have been met. *Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000).

## II. Claims at Issue

As an initial matter, it is necessary to clarify what claims are at issue in this case. Plaintiff generally alleges in her Second Amended Complaint ("Complaint") that defendants engaged in a "pattern of discrimination, retaliation, misrepresentation, misinformation, harassment, character assassination, creation of a hostile workplace, abuse and manipulation of laws, rules, and regulations on the basis of plaintiff's race and color." Second Am. Compl. ¶ 2. To that end, the Complaint contains five counts against the various defendants. In Count I, plaintiff alleges against CUNY wrongful termination on the basis of race in violation of Title VII. In Counts II through V, all alleged against the individual defendants, plaintiff claims wrongful termination and disparate treatment in violation of 42 U.S.C. § 1981 (Count II); deprivation of her Fourteenth Amendment rights to due process and equal protection in violation of 42 U.S.C. § 1983 (Count III); participation in, and condonation of, a policy of "unequal treatment and discrimination" on the basis of race, also in violation of 42 U.S.C. § 1983 (Count IV); and wrongful termination on the basis of race in violation of the NYSHRL (Count V).

Defendants make two arguments as to the pleading of plaintiff's claims. First, they argue that the § 1981 claim fails as an independent claim under *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), where the Supreme Court held that "the express 'action at law' provided by § 1983 . . . provides the exclusive federal damages remedy for the violation of the

rights guaranteed by § 1981 when the claim is pressed against a *state* actor." *Id.* at 735 (emphases added). The holding in *Jett* has subsequently been interpreted to encompass not only governmental entities but also individuals sued in their individual capacities who are "state actors." *Roddini v. City University of New York*, 2003 WL 435981, at \*5 (S.D.N.Y. 2003) (Preska, J.). "State employment has generally been deemed sufficient to render the defendant a 'state actor.'" *Id.* The individual defendants here, all sued in their individual capacities, are all employees of CUNY and are therefore "state actors" subject to *Jett*. *See id.* (holding same in another discrimination case against CUNY and various CUNY individuals named in their official and individual capacities). Therefore, plaintiff does not have an independent § 1981 claim against these defendants.[8] The court will accordingly construe plaintiff's § 1981 claim as brought pursuant to § 1983. The same "core substantive standards" apply to plaintiff's claims of discrimination, and the parties have briefed these claims together. *Cf. Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (holding that the same "core substantive standards that

---

[8] There is an unsettled question among the Circuits as to whether § 1981(c), an amendment introduced as part of the Civil Rights Act of 1991, statutorily overrules *Jett*. By holding that § 1983 is the exclusive federal remedy for violations of § 1981, the Court essentially held that § 1981 was "merely one law" that could give rise to a § 1983 claim. *Philippeaux v. North Central Bronx Hospital*, 871 F. Supp. 640, 654 (S.D.N.Y. 1994). But § 1981(c) added that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." Some courts have divided on whether § 1981(c) now creates an implied private right of action against state actors under § 1981. *Compare, e.g.*, *Dennis v. County of Fairfax*, 55 F.3d 151, 156 n.1 (4th Cir. 1995) (finding that *Jett* was unaffected by the amendment), *with Federation of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1205 (9th Cir. 1996) (finding that the amendment "statutorily overrules" *Jett*). The Second Circuit has not yet addressed the issue, *see Anderson v. Conboy*, 156 F.3d 167, 178 n.19 (2d Cir. 1998), and, as described in the text, courts in this Circuit have continued to abide by the Supreme Court's analysis of § 1981 as pronounced in *Jett*, *see, e.g.*, *Roddini*, 2003 WL 435981, at \*5 n.7 (refusing to "deviate from the Supreme Court's analysis of § 1981 in *Jett*).

apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981).

Second, defendants argue that plaintiff has not pled any claim besides discrimination and that the "litany of conclusory allegations" in the Complaint do not sufficiently assert independent claims for retaliation or hostile work environment. Plaintiff does not directly address defendant's point, arguing only that the evidence sufficiently supports her claims for retaliation and hostile work environment. Given the "simplified notice pleading standards" applicable here and the fact that the parties have briefed the retaliation and hostile work environment claims, the court regards these claims as proper for consideration on a motion for summary judgment. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002) (holding that the "simplified notice pleading standard . . . relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims").

In sum, plaintiff brings a discrimination claim against defendant CUNY pursuant to Title VII and a discrimination claim against the individual defendants pursuant to § 1983 and NYHSRL.[9] Specifically, as to plaintiff's § 1983 claim, plaintiff alleges that the individual defendants violated § 1981 and the Fourteenth Amendment.[10] Plaintiff also alleges against the

---

[9] Individuals are not subject to liability under Title VII. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam).

[10] It is unclear what claim plaintiff is pursuing under the Fourteenth Amendment. On one hand, it appears plaintiff construes her retaliation claim as tantamount to her equal protection claim raised in Count III of her complaint. Pl.'s Opp. Br. at 5 ("Defendants have failed to address plaintiff's retaliation claim under the Equal Protection Clause of the Fourteenth Amendment."). On the other hand, plaintiff appears to conflate her due process and equal protection arguments, contending that "intentional discrimination may be demonstrated by a departure from procedural norms." *Id.* at 6. However, plaintiff also fails to respond at all to defendants' argument that she does not have a procedural due process claim as to her termination because she lacked a property right in her position.

defendants a hostile work environment claim in violation of Title VII, §§ 1981 and 1983, and the NYSHRL, and a retaliation claim in violation of Title VII, § 1981, and the NYSHRL.

## III. Claims Against Defendant Goldstein

Plaintiff's claims of discrimination, retaliation, and hostile work environment brought against Mr. Goldstein pursuant to §§ 1981 and 1983 and the NYSHRL cannot survive defendant's motion for summary judgment because plaintiff fails to establish the "personal involvement" or "active participation" necessary to impose liability under these statutes. It is "well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065-66 (2d Cir. 1989). Plaintiff must show some "personal responsibility" of the defendant. *Al-Jundi*, 885 F.2d at 1065. Similarly, an individual cannot be held liable for discriminatory conduct under the NYSHRL unless that individual "actually participate[d] in the conduct giving rise to a discrimination claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998); *Hirsch v. Columbia University*, 293 F. Supp. 2d 372, 377-78 (S.D.N.Y. 2003) (same).

That an individual occupies "a high position of authority is an insufficient basis for the imposition of personal liability," *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978), and a defendant who occupies a supervisory position cannot be found liable on the basis of *respondeat superior*. *Wright*, 21 F.3d at 501. An individual in a supervisory role may be found "personally involved" in one of several ways:

> (1) the defendant participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation through

a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (citations omitted)).

Here, the record is clear that the extent of Mr. Goldstein's involvement in this action is limited to his receipt and forwarding of plaintiff's letters of appeal regarding her non-reappointment. By letters dated March 14, 2003 and April 9, 2003, plaintiff appealed her non-reappointment to Mr. Goldstein, and, according to the usual practice of his office, he forwarded the letters to Mr. Dobrin, the administrator responsible for supervising the SPCB unit of OFPCM. On April 18, 2003, Mr. Dobrin responded to both of plaintiff's letters, denying her appeal and explaining that her non-reappointment was due to CUNY's "budgetary constraints." Goldstein Exh. D.

Plaintiff argues that, by failing to respond to her letters and her "request for assistance," Mr. Goldstein "condon[ed] the discriminatory treatment" that she allegedly endured. Pl.'s Br. at 27. "Direct participation" is not always necessary to establish § 1983 liability, and a supervisory official may be personally liable if he has "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Al-Jundi*, 885 F.2d at 1066 (quoting *Meriwether v . Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989)). However, Mr. Goldstein's decision to delegate plaintiff's appeal to a subordinate who supervises the department in which plaintiff worked, rather than provide a personal response, does not demonstrate "gross negligence" or "deliberate indifference." *See, e.g.*, *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding that Commissioner of New York State Department of

Corrections was not liable under § 1983 for referring plaintiff's first letter of appeal to a subordinate or for summarily responding to plaintiff's second letter requesting a status update on his appeal); *Gayle v. Lucas*, 1998 WL 148416, *4 (S.D.N.Y. 1998) (holding same in context of a supervisory official ignoring a prisoner's letter protesting unconstitutional conduct); *Woods v. Goord*, 1998 WL 740782, *6 (S.D.N.Y. 1998). Even if Mr. Goldstein had not forwarded plaintiff's letters, as is the customary practice of the Chancellor's office, "the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement."[11] *Thomas v. Coombe*, 1998 WL 391143, *6 (S.D.N.Y. 1998); *see also Gayle v. Lucas*, 1998 WL 148416, *4 (S.D.N.Y. 1998) ("Generally, the allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983.").

In short, plaintiff offers only her unsubstantiated allegation that Mr. Goldstein condoned the discriminatory treatment against her, which is insufficient to withstand a motion for summary judgment. *See Weinstock*, 224 F.3d at 41; *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986). Defendant Goldstein is therefore granted summary judgment on all of plaintiff's claims against him.

## IV. Claims Against the Other Defendants

### A. Discriminatory Termination

---

[11]  For the same reason, it is immaterial whether plaintiff sent and defendant received a letter of appeal dated April 4, 2003, Pl.'s Exh. CC, a letter that defendant claims plaintiff failed to authenticate in her declaration or provide any "competent evidence" as to whether she actually sent the letter to Mr. Goldstein. Plaintiff argues that the content of April 4, 2003 letter was "more than clear as to the details of [her] complaints and the need for defendants to take action about her wrongful and discriminatory treatment." Pl.'s Br. at 27-28. However, without more, Mr. Goldstein's receipt of the contested letter does not rise to level of personal involvement necessary to establish § 1983 liability.

Plaintiffs' claims of race discrimination, brought under Title VII, §§ 1981 and 1983, and the NYSHRL are all analyzed under the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Patterson*, 375 F.3d at 225; *Mack v. Otis Elevator Co.*, 216 F.3d 116, 122 n.2 (2d Cir. 2003). First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802-04. Plaintiffs' burden of proof at this threshold step is minimal. *Howley v. Stratford*, 217 F.3d 141, 150 (2d Cir. 2000). Second, if the plaintiff successfully proves a prima facie case, a presumption of unlawful discrimination arises and the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.*; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Third, if the defendant carries this burden, the plaintiff must then have an opportunity to demonstrate that the proffered reason is in fact a pretext for intentional discrimination. *McDonnell Douglas*, 411 U.S. at 802-04; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993). At all times, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff. *Burdine*, 450 U.S. at 253.

### 1.    Prima Facie Case

Defendant does not dispute that plaintiff satisfies the first three elements necessary to prove a prima facie case, but argues that there is no evidence that plaintiff's non-reappointment occurred under circumstances giving rise to an inference of discrimination. Often, "[b]ecause an

employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination . . . is usually constrained to rely on circumstantial evidence." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). Circumstances that may raise a permissible inference of discriminatory intent may include:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the sequence of events leading to the plaintiff's discharge.

*Abdu-Brisson*, 239 F.3d at 468 (quoting *Chambers*, 43 F.3d at 37 (citations omitted)). Plaintiff may also raise such an inference by "showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). On a motion for summary judgment, the court does not decide what inferences should be drawn but determines "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Chambers*, 43 F.3d at 38.

Although plaintiff introduces a variety of evidence in support of her prima facie case of discrimination, the proffered evidence ultimately fails to raise issues of material fact establishing that her termination occurred under circumstances indicating discrimination on the basis of race. To begin with, despite plaintiff's argument that Nancy Nichols, a white female, "*ultimately replaced plaintiff's position and functions,*" Pl.'s Opp. Br. at 6-7, there is no evidence that defendants sought a replacement for plaintiff to fill her old position. Plaintiff does not dispute that, upon her non-reappointment, her job responsibilities were delegated to a number of existing employees, including Ms. Brooks, an African-American, who took over plaintiff's duties as Ms. Gartner's executive assistant, as well as to other African-American employees. Plaintiff also

does not dispute that Ms. Nichols was hired in November 2003 to replace Ms. Brooks, who resigned and moved out of state, or that Ms. Nichols initially assumed Ms. Brooks's title as "Special Assistant to the Construction Fund." That Ms. Nichols presently holds the title of "Special Assistant to the Construction Fund and Director of the SPCB" and carries out some of plaintiff's old responsibilities, including those initially assumed by Ms. Brooks as well as those reassigned to Mr. Lechicky, does not support plaintiff's contention or raise an issue of material fact as to whether defendants actually sought and hired a replacement for plaintiff's position. The hybrid title and joint responsibilities that Ms. Nichols now assumes establishes that plaintiff's position no longer exists in its old form, and the record confirms that Ms. Nichols's job description includes some of plaintiff's responsibilities in addition to those that were carried out by Ms. Brooks. Without more, plaintiff's claim that Ms. Nichols was not a bona fide replacement for Ms. Brooks amounts to unsupported conjecture. *See Eng v. Beth Israel Medical Center*, 1995 WL 469704, at *2-3 (S.D.N.Y. Aug. 7, 2005) (holding, in an age discrimination suit, that summary judgment could not be defeated where plaintiff offers an unsupported argument that he was "ultimately" replaced by a younger employee because the initial replacement, who was older than plaintiff, rescinded his acceptance).

Plaintiff is correct to argue that, even if she was not replaced by a non-protected class member after her termination, she can still establish a prima facie case of discrimination. However, the record here does not contain other evidence justifying an inference of discrimination. Plaintiff testified at her deposition that none of the defendants criticized her performance in racially degrading terms or made any direct comments about her race. Plaintiff also testified that none of the defendants made express, invidious comments about other African-Americans. For example, plaintiff testified that she did not hear Ms. Gartner criticize David

Freedman, an African-American male who performed information technology services and had direct contact with Ms. Gartner.[12]  The only allegedly discriminatory remark that plaintiff points to is a statement she overheard Ms. Gartner make at some point between June 1999 and December 2000 during a conversation about the provision of temporary trailers to Medgar Evers College, a predominantly African-American school.   Although plaintiff characterizes Ms. Gartner's comment that she did not want to "give those people more than absolutely necessary" as discriminatory and evidence of her dislike of African-Americans, plaintiff provides an insufficient context from which to determine whether Ms. Gartner's remark was race-related. Even if the court were to give plaintiff that favorable inference, the statement is "remote and oblique . . . in relation to the employer's adverse action," making it less probative that plaintiff's non-reappointment was motivated by discrimination.  *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007).  Ms. Gartner's statement, which was uttered as late as 2000, approximately three years prior to plaintiff's non-reappointment, was not directed at plaintiff and did not concern any issue relevant to her employment status.  Given that there is nothing in the record that "ties" Ms. Gartner's isolated remark to plaintiff's non-reappointment, the statement is not legally sufficient to sustain a reasonable inference that defendants were motivated by race discrimination in terminating plaintiff.  *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998); *Morris v. New Yor City Dept. of Sanitation*, 2003 WL 1739009, at *6 (S.D.N.Y. 2003) ("Not all comments will constitute direct evidence of discrimination. . . . [S]tray remarks in the

---

[12]   Plaintiff claims in her declaration that she had "many conversations with David Freeman [sic], and was personally aware that [he] did not 'trust' Defendant Gartner."  Pl.'s Decl. ¶ 25.   Yet defendants produced evidence from plaintiff's own deposition to support their statement that Mr. Freedman "never advise[d] plaintiff that he believed Ms. Gartner was discriminating against him because of his race."   Indeed, plaintiff had testified that she never spoke with Mr. Freedman regarding her "views that [she was] being discriminated against by Lea because [she was] African-American" and that he never made "any statement to [her] that he felt discriminated against by Lea Gartner."  Westbrook Dep. at 156-57.

workplace, by themselves, and without a demonstrated nexus to the complained of personnel actions, will not defeat the employer's motion for summary judgment."); *Castro v. Local 1199*, 964 F. Supp. 719, 726 (S.D.N.Y. 1997) (finding it "significant" that allegedly discriminatory comments "were not expressly directed at plaintiff").

There is also nothing about the sequence of events leading to plaintiff's termination that raises an inference of discrimination on the basis of race. At most, plaintiff supports an inference that she had personal differences and relational problems with Ms. Gartner that may have led to her non-reappointment. That Ms. Moore-Wilk, a white female who was the Assistant Director of SPCB, had also complained about Ms. Gartner's treatment of her and other SPCB staff and that, subsequent to this complaint, Ms. Macari advised Ms. Hawkins and Ms. Moore-Wilk to "seek counseling and professional coaching from a consultant in order to guide Ms. Gartner into improving her leadership skills and easing the tensions within that unit" does not support plaintiff's claim of discrimination. Hawkins Dep. at 56-58. That Ms. Gartner may have been a difficult supervisor to several of her employees does not raise an inference that plaintiff was terminated because of her race. "Title VII does not establish a 'general civility code' for the American workplace," *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)), and "[c]onduct motivated by personal animosity does not run afoul of Title VII's prohibition against altering the terms and conditions of employment because of . . . race," *Stepheny v. Brooklyn Hebrew School for Special Children*, 356 F. Supp. 2d 248, 263 (E.D.N.Y. 2005).

The record also does not support plaintiff's contention that other African-American employees of OFPCM, specifically those under the supervision of Ms. Gartner, experienced similar adverse treatment or "excessive scrutiny or harassment" when compared to employees

outside of the protected class.  Pl.'s Opp. Br. at 5.  Plaintiff cites the termination of Mr. Cox and the non-reappointment of Mr. Togbah as evidence that African-Americans at OFPCM experienced racially disparate treatment, but the record fails to support the facts necessary to sustain plaintiff's allegation.  Without any citation to the record, plaintiff alleges in her declaration that, despite defendants' claim that Ms. Gartner terminated only two employees, both of whom were white, during her tenure at CUNY, Ms. Gartner also terminated Mr. Cox. However, defendants produced documentary evidence that Mr. Cox requested and exhausted his family leave from March 2, 1999 to March 12, 1999 and then proceeded to take unauthorized leave without pay.  Ms. Macari testified in her declaration that Mr. Cox did not return to his position, but abandoned his position.  Macari Reply Decl. ¶ 3.  Similarly, plaintiff's claim that that there is evidence of disparate treatment with respect to defendant's decision not to reappoint Mr. Togbah but to retain Angela Guitierrez, an Hispanic female, is not supported by the record. The record establishes that Mr. Togbah failed the first portion of the examination, the word-processing test, while the other three College Assistants, including Ms. Guitierrez, passed the same portion and were temporarily appointed as Office Assistants.  In addition to Ms. Guitierrez, the retained group of College Assistants included one African-American woman and another Hispanic woman.  It is also undisputed that Mr. Togbah was replaced in June 2003 by Joyce Briscoe, an African-American employee who was hired on a part-time basis.  *Cf. Yarde v. Good Samaritan Hospital*, 360 F. Supp. 2d 552, 560 (S.D.N.Y. 2005) (recognizing that replacement by another in the same protected class weighs against an inference of discrimination); *Montonaile v. Nat'l Broadcast Co.*, 211 F. Supp. 2d 481, 187 (S.D.N.Y. 2001) (same).

## 2. Legitimate, Non-discriminatory Reason

Assuming plaintiff has presented a prima facie case of discrimination here, the defendants would then have the burden of producing "through the introduction of admissible evidence reasons for its actions, *which if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks omitted).

Here, defendants have articulated that plaintiff was not reappointed to her position because of the budgetary constraints at CUNY in 2003. It is undisputed that, because of the budgetary constraints at the time, CUNY implemented a hiring freeze, effective February 3, 2003, and Mr. Dobrin held a meeting with the university's Vice-Chancellors during which the participants agreed to eliminate positions they deemed unnecessary. Ms. Macari, as Vice-Chancellor of OFPCM, determined based on her personal knowledge of the staff's functions that plaintiff's position could be eliminated and her responsibilities distributed to existing employees. Defendants' explanation for plaintiff's non-reappointment is a legitimate business rationale for its action.

### 3. Pretext for Intentional Discrimination

When an employer articulates a nondiscriminatory reason for its action, as defendant has done here, the presumption of discrimination "completely drops out of the picture" and "the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). An employer's "reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 512 (citation omitted). In the summary judgment context, this means the plaintiff must "establish a genuine issue of material fact either through direct,

statistical, or circumstantial evidence as to whether the employer's reason for its decision to discharge is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Servs. Ltd.*, 22 F.3d 1219, 1225 (2d Cir. 1994).

In addition to the arguments offered as part of her prima facie case, plaintiff lists a number of reasons for rejecting defendants' nondiscriminatory reason for terminating her employment. Plaintiff first contends that there is "ample evidence[] to refute the defendants' contention that there ever *was* a policy set up, to 'eliminate' unessential positions." Pl.'s Opp. at 15. In support, plaintiff points to the fact that the directive was not set in writing or distributed to senior management in writing and that Mr. Dobrin could not recall many of the details regarding his alleged directive to eliminate unnecessary positions. Plaintiff also points to the fact that Mr. Dobrin stated, in response to her appeal letter, that her non-reappointment was due to budgetary "constraints," but then testified that he did not know what budget plaintiff was being paid out of at that time. Pl.'s Opp. Br. at 8-9. None of these points raises a genuine issue of material fact as to whether defendants' proffered reason is a pretext for discrimination. To begin with, without more, plaintiff cannot simply raise an issue of fact by suggesting, without any evidence whatever, that because the staff meeting was not documented in writing, the meeting could not have occurred. Mr. Dobrin testified that there were no minutes kept at his staff meetings. Dobrin Dep. at 9. That Mr. Dobrin cannot recall certain details such as or whether he gave a specific dollar amount as to job cuts or how many actual jobs were cut after the directive was issued also do not establish that "the reasons given for terminating plaintiff were inconsistent, false and pretextual." Pl.'s Opp. at 16.

Plaintiff goes on to argue that, even if there were such a policy, the elimination of her position did not alleviate any budgetary constraints because her salary was not paid out of CUNY's operating budget. There is no dispute that the salaries of tax levy employees such as plaintiff are paid from DASNY bond proceeds that fund CUNY's capital budget. Plaintiff, however, offers no response to the fact these bond proceeds are ultimately used to reimburse the salary amount into the operating budget, which initially advances the amount. The record establishes that payment of these salaries, even through the reimbursement procedure, affected overall cash flow in the CUNY operating budget. Also, Ms. Macari testified that elimination of unnecessary OFPCM salaries freed up funds in the capital budget to be used for other purposes, such as covering construction costs. Macari Decl. ¶ 27.

Plaintiff also generally challenges defendants' explanation that the budgetary constraint affected the university and points to defendants' decisions to increase staffing and to retain less senior, non-African-American employees. Plaintiff claims that Ms. Macari hired new clerical, administrative and project management employees, even though their salaries would increase OFPCM's costs. However, the record establishes that, subsequent to plaintiff's non-reappointment, there was no net increase in the administrative staff and salaries at OFPCM. Macari Reply Decl. ¶ 13. Defendants further established that the new hires filled professional, not administrative, positions and that, because their salaries were paid out of funds independent of CUNY's operating budget, these hires were not subject to the same budgetary constraints affecting tax levy employees such as plaintiff. *Id.* ¶ 11.

Defendants' hiring of Wendy Kalan also is not evidence that defendants' reason for plaintiff's non-reappointment was false. Plaintiff argues that Ms. Kalan was hired at a higher salary than hers even though she was already a "well-functioning . . . employee . . . who would

not need training or other expenditures that new employees often require." Pl.'s Opp. Br. at 10. But plaintiff does not dispute that Ms. Kalan was hired as a Project Manager, a non-administrative and more technical position for which plaintiff was not professionally qualified. Furthermore, that Ms. Macari added a "new, larger salary," even though she knew of an impending hiring freeze, does not create an issue of fact as to whether Ms. Kalan was offered her job prior to the implementation of the hiring freeze, a fact plaintiff cannot dispute. Thus, plaintiff cannot argue that the decision to hire Ms. Kalan was an exception to the hiring freeze policy.

Plaintiff also cannot establish that defendants' reason for her non-reappointment was pretextual by producing evidence that she received several positive evaluations during her tenure at CUNY, particularly during the period preceding Ms. Gartner's appointment as Director of SPCB. Defendants do not dispute such evidence, recognizing that "[t]here is nothing inconsistent about plaintiff's receiving positive evaluations but nevertheless occupying a position that, due to functions the position performed and the experience it required, could be eliminated without jeopardizing the operation of the office." Dfs.' Br. at 22. Indeed, defendants never argue that plaintiff was not reappointed to her position because of lackluster performance. Rather, defendants establish in the record that, because of university-wide budgetary constraints, Ms. Macari determined, in accordance with Mr. Dobrin's directive to eliminate unnecessary positions where possible, that the administrative staff was more "expendable" than positions requiring more technical expertise and, more specifically, that plaintiff's job responsibilities could be redistributed to existing employees without disrupting the operation of the office. Plaintiff does not dispute that there were only a limited number of administrative employees who could be terminated because they were not protected by a CCA or that Ms. Brooks, an African-

American administrative employee unprotected by a CCA, was retained. Plaintiff provides no more than her unsupported assertions as to why other non-CCA protected employees, such as Mr. Lechicky and Ms. Hawkins, were better suited for nonreappointment. For example, plaintiff cites only to her own observations in support of her claim that Mr. Lechicky was an Executive Assistant, and not a Capital Program Coordinator who possessed specialized skills in administering construction project reports and proposals, and that she was therefore "very familiar" with his job tasks of answering the phone, making copies, and keeping his supervisor's calendar. Pl.'s Decl. ¶ 53. Ultimately, plaintiff's arguments amount to no more than a personal disagreement with Ms. Macari's decision, and Title VII may not be used as a vehicle for second-guessing an employer's business judgment.[13] *See Scaria v. Rubin*, 117 F.3d 652, 654-55 (2d Cir. 1997) (citing *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions.").

In sum, the record lacks evidence that the defendant terminated plaintiff because of her race, and, "[w]ithout supplying actual examples of discrimination, 'conclusory allegations of discrimination are insufficient' to defeat a motion for summary judgment." *Eng*, 1995 WL 469704, at *5 (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985)). Plaintiff has not adduced evidence of impermissible racial animus on the part of any of the defendants. The record, taken as a whole, is insufficient to raise a material issue of fact as to whether discrimination was the real reason for plaintiff's non-reappointment. Put another way, no reasonable jury could conclude on this record that plaintiff was terminated

---

[13] That plaintiff also offers Ms. Brooks, an African-American employee, as another example of an individual who could have had her position "easily eliminated" provides further support for the conclusion that plaintiff ultimately disagrees with Ms. Macari's assessment of what positions at OFPCM were deemed "unnecessary."

because of her race.  Defendants CUNY, Macari, and Gartner are accordingly granted summary judgment as to plaintiff's discriminatory termination claim.

**B.      Hostile Work Environment**

The standards for a hostile work environment claim under Title VII, §§ 1981 and 1983, and the NYSHRL are generally the same.  *Whidbee v. Garzarelli Food Specialities, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000).  To establish a hostile work environment claim, plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted); *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004).  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).  An isolated act cannot generally meet the threshold of severity or pervasiveness unless, "by itself, it can and does work a transformation of the plaintiff's workplace."  *Id.* (citing *Howley v. Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)); *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) (holding that an isolated act will not suffice to establish actionable harassment unless it is very severe)).  The test also has both objective and subjective elements, with the ultimate question being "whether a reasonable person would have found [the work environment] to be [hostile], and if the plaintiff subjectively so perceived it."  *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004).  Whether a reasonable person would find a given work environment to be hostile depends on the totality of the circumstances, including "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating,

or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance." *Brennan*, 192 F.3d at 319 (citing *Harris*, 510 U.S. at 23). Conduct that fails to meet the objective component of the test "is beyond Title VII's purview." *Harris*, 510 U.S. at 21.

Without explanation or argument, plaintiff summarily cites to various pieces of evidence in the record and concludes that "she has sufficiently demonstrated a claim for a hostile work environment." Pl.'s Opp. Br. at 25-26. For instance, plaintiff does not explain how defendants' distribution of her job responsibilities to employees of various races or their hiring of Ms. Nichols for Ms. Brooks's position supports a claim for hostile work environment. Plaintiff also cannot demonstrate a hostile work environment by offering evidence that Ms. Gartner was initially opposed to her hiring or that she was an exemplary employee during the period preceding Ms. Gartner's supervision.

The only evidence plaintiff offers in support of her claim is her allegation that Ms. Gartner, "on October 4, 2002 and on several occasions thereafter," demanded that she personally clean the kitchen of the 57th Street Office. However, even if plaintiff's evidence were undisputed, her hostile work environment claim fails for the same reason as her discrimination claim—there is no evidence that the creation of any alleged hostile work environment by defendants was because of her race. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile work environment or through such concrete deprivations as being fired . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic."). Furthermore, while plaintiff may have found these interactions with Ms. Gartner to be "unpleasant," no reasonable jury could find them to be sufficiently "severe" to "alter the conditions" of her

employment.  *See Meder v. City of New York*, 2007 WL 1231626, at *5 (E.D.N.Y. 2007) ("[A]

hostile work environment is something more than having a difficult or aggressive boss.  It is a

pervasively toxic environment, necessarily affecting the terms and conditions under which one is

employed.")

Defendants are therefore granted summary judgment on plaintiff's claim of hostile work

environment.

### C.      Retaliation

A claim of retaliation brought under Title VII, § 1981, and the NYSHRL, as with a claim

for discrimination, is analyzed under the burden-shifting framework of *McDonnell-Douglas*.  *See*

*Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).  To establish a prima facie case of

retaliation, plaintiff must demonstrate that: (1) she was engaged in a protected activity: (2) the

employer was aware of plaintiff's participation in the protected activity; (3) the employer took

adverse action against plaintiff; and (4) a causal connection existed between plaintiff's protected

activity and the adverse action taken by the employer.  The burden of proving a prima facie case

of retaliation is *de minimis*.  *Kessler v. Westchester County Dept. of Social Servs.*, 461 F.3d 199,

205-06 (2d Cir. 2006).

Plaintiff claims that defendants retaliated against her, in response to her filing a

grievance with the union, by forcing her to exhaust her annual leave rather than return to work.

However, plaintiff does not dispute that, when an individual is not reappointed to her position,

her department retains the discretion to determine whether the employee must liquidate any

accrued annual leave prior to the expiration of the current appointment period or be paid for all

or a part of the accrued annual leave in a lump sum at the expiration of the appointment period.

Plaintiff also does not dispute that, although her accrued annual leave did not cover her absence

from the office until the end of her appointment on June 30, 2003, defendants provided five extra days of pay in addition to all of her accrued annual leave, which covered her to the very last day of her appointment period. Thus, plaintiff cannot establish that there was any "adverse action" taken against her. She was required to exhaust her annual leave in accordance with department practice and the CBA, and she received a windfall payment for five additional days that she did not work.

Defendants are therefore granted summary judgment as to plaintiff's claim of retaliation against them.[14]

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment on all of plaintiff's claims against them is granted. The Clerk of Court is directed to enter judgment for defendants.


**SO ORDERED.**


_____/s_____
**NINA GERSHON**
**United States District Judge**


Dated:     December 19, 2008
           Brooklyn, New York

---

[14]   To the extent plaintiff claims that defendants retaliated against her by refusing to reappoint her to her position, that claim fails for the same reasons that her termination claim was found to be without merit.